**FLORIDA DISCOUNT CENTERS, Inc., et al v. STATE ATTORNEY, et al.**
Nos. 170733 and 170775.

Circuit Court, Hillsborough County.

August 13, 1968.

William R. McCown and Robert H. Carlton, both of Tampa, for Florida Discount Centers, Inc.

Paul Antinori, Jr., State Attorney, for the defendants in #170733.

Milton J. Wallace, Miami, for the plaintiffs in #170775.

JOHN G. HODGES, Circuit Judge.

*Findings of fact, conclusions of law and final judgment:* This matter, involving two suits which have heretofore been declared to be companion causes and consolidated for trial by this court, came before the court on July 25, 1968, for final hearing on the issues formulated by the pleadings.

The complaint in the first suit, no. 170733, brought by Florida Discount Centers, Inc., a Florida corporation, Robert H. Carlton, Lawrence Duffy and Doris Lott, as officers of the corporation and individually, and as members of a class of persons participating in the market plan of the corporation, plaintiffs, against Paul Antinori, Jr., as state attorney in and for the thirteenth judicial circuit of Florida, and Fred O. Dickinson, Jr., Broward Williams and Earl Faircloth, constituting and being the Florida Securities Commission, defendants, alleges that the plaintiffs are at the present time engaging in and participating in a sales market plan in the state of Florida, principally in Hillsborough County.

The complaint further alleges that the plan and its operation are set forth in a manual attached to the complaint and made a part thereof. It is further alleged that the plaintiffs have been

entering into contracts with other persons in the implementation of the plan, and a copy of the contract used is also attached and made a part of the complaint.

Plaintiffs then allege that there is a justiciable question as to whether or not the plan and contract fall within the provisions of chapter 517 of the Florida Statutes pertaining to the sale of securities in the state of Florida and also as to whether or not the plan and contract constitute a violation of the criminal laws of the state of Florida, and in particular chapter 849 of the Florida Statutes pertaining to lotteries.

Concluding the factual allegation portion of their complaint, the plaintiffs state that the market plan and contract being employed by them have never been operated in the state of Florida and that a cloud of doubt and suspicion has been cast upon the plaintiff's activities, because of the possible violations involved, which is causing or will cause irreparable losses to the plaintiffs. They state that this uncertainty as to the applicability of the sales market plan and contract, or either of them, as they pertain to the statutes prohibiting lotteries and certain types of securities, places them in an awkward and untenable position.

The plaintiffs pray for a declaratory judgment determining that the sales market plan and contract, and both of them, do not fall within the provisions of chapter 517 or chapter 849 of the Florida Statutes.

The answer of Paul Antinori, Jr., as state attorney in and for the thirteenth judicial circuit, one of the defendants in the said cause, admits certain allegations of the complaint but denies that there is any doubt as to the applicability of chapters 517 and 849 with regard to the sales market plan involved, but to the contrary alleges that the plan involves the sale of securities as defined by chapter 517 and constitutes an illegal pyramid or chain club organization as defined by chapter 849 of the statutes.

The answer then prays for a declaratory judgment determining that the sales market plan and contract entered into between the plaintiffs and other persons are a security transaction as defined by Florida law, requiring the registration of such securities with the Florida Securities Commission, and that the sales market plan constitutes a lottery as defined by chapter 849 of the statutes.

In the second suit, no. 170775, wherein the state of Florida, by Fred O. Dickinson, Jr., comptroller, Earl Faircloth, attorney general, Broward Williams, state treasurer, as and constituting the Florida Securities Commission, is plaintiff, and Florida Discount

Centers, Inc. and the other plaintiffs in the initial suit are defendants, the complaint alleges that the defendant corporation, by and through the defendants, has offered for sale and has sold, and is now offering for sale, and may continue to offer to sell to the public, securities in the form of an interest in or under a profit-sharing or participation agreement, or scheme or investment contract. It is further alleged that these securities have not been registered with the commission, as required by law, nor have any of the individual defendants registered as securities dealers, as required by law.

The complaint avers that the defendants have sold such contracts to more than 340 investors. They state that the defendants, as of July 1, 1968, had collected approximately $151,000 from investors and that approximately $100,000 of that amount has been expended for commissions paid to the individual defendants and to investors for commissions in return for soliciting additional investors and for other expenses.

Other allegations of the complaint set forth purported facts relative to the alleged profit-sharing agreement and sales promotional plan being employed by the defendants, concluding that the essence of the said plan is a "Ponzi"-like pyramid and prohibited by law because it involves a lottery.

The plaintiffs in this suit state that unless the defendants are restrained and enjoined from engaging in the unlawful and fraudulent acts complained of, as set forth in the complaint, they will continue to engage in said acts, contrary to law, and pray that the court will enter a temporary and final injunction against the defendants, enjoining and restraining them from continuing the alleged unlawful operations which, if continued, would result in a fraud upon the purchasers of the contracts involved.

To that complaint the defendants have filed an answer denying all of the material allegations of the complaint relative to the unlawful nature of the sales market plan and contract involved, and request the court to dismiss the complaint and vacate the temporary injunction which has heretofore been ordered in the cause by the court.

A temporary injunction, as requested by the plaintiffs, has heretofore been entered herein by the court upon showing made at the initial hearing in the matter. Immediately prior to the commencement of the final hearing, a petition for intervention, under Rule 1.230, was filed in this cause by Alabama Market Centers, Inc., an Alabama corporation, alleging a purported contract between the intervenor and one of the officers and directors

of the defendant, Florida Discount Centers, Inc., and proposing to file a complaint seeking an injunction and monetary damages for breach of said contract. After a brief legal discussion with the court, counsel for the petitioner withdrew the claim for monetary damages.

The subject matter of the intervention requested was not germane and would have injected new issues into the suit relative to the purported contract and its alleged breach and would have interfered with the trial of the issues in the main proceedings. The court, therefore, denied the said petition for intervention and granted petitioner an exception to its ruling. The petitioner was offered the right to intervene as a party defendant operating the same type of sales market plan in another area of Florida, but declined the offer.

It is quickly observed that the pleadings in the two suits present one question which is common to both. That question involves the issue of whether or not the sales market plan and the promotion and sale of the contract involved amount to a security within the purview and intent of the Florida Securities Law.

The remaining issue of whether or not the transactions, under the facts, constitute a lottery under Florida law is involved only in the first suit. After a careful examination of the pleadings and affidavits and a thorough consideration of the arguments and briefs of counsel, the court makes the following —

### Findings of fact

Florida Discount Centers, Inc. is engaged in an enterprise or sales market plan wherein the promotion and sale of sewing machines and kitchen sets for use in private homes under a commission agreement known as a "founders' contract" is involved.

Under the promotional plan, sponsored and franchised by Florida Discount Centers, Inc., but designed by others in Alabama, prospective participants in the enterprise are required to purchase for $320, either a sewing machine called a "Morse Sewing Center", or a kitchen set, the invoice cost of which is approximately $60, to become a distributor salesman or "founder". In return for the purchase price, the purchaser receives, in addition to the merchandise, the "founders' contract", entitling him to participate in certain commissions from the sale to other persons solicited by him of similar merchandise.

For each unit sold to others furnished by the founder, he receives a commission of $60. Other pertinent parts of the scheme or plan are as follows —

The funds, amounting to $320, from the initial purchase and sale, are divided as follows — An amount equal to the total cost of the merchandise (approximately $65) is placed in a "production and commission account" at the Peninsula State Bank. Sixty dollars is paid as a commission to the founder who brings the purchaser to the sales meeting wherein the particular sale is consummated. Ten dollars is given to his supervisor, as an override commission; an additional $10 is paid to the "speaker" (salesman) who makes the sales talk to the purchasing prospect; $10 to the "speaker-trainer"; a sales tax based upon a sale of $150 is taken out and the balance of the sales profit is then used for operating expenses of the corporation and whatever remains is intended to be "used to assist in opening the store" (amended answer, paragraph 7; witness Lott, pages 47, 49, 68 and 69 of transcript).

As a matter of fact, however, "for convenience in bookkeeping", the gross profit on the $320 sale, including all commissions in the amount of $235, is deposited in the "production and commission account", and from this account the following payments are made by check drawn by the corporation against the account, each check being signed by a corporate officer and one of four designated founders (page 70 of the transcript) — $60 to the founder, $10 override to the supervisor, $10 to the speaker, and $10 to the speaker-trainer in the Tampa area. In addition, officers and directors receive additional overrides to defray expenses and pay for their "time" in "helping founder salesmen to make the sales". (Lott, page 48, transcript) The sales tax rate, based upon a sale of $150, was arbitrarily used because that rate had been used in a similar operation in Alabama.

The production and commission account is referred to by corporate officers and promoters as "the escrow account" from time to time. However, the account is used for purchase of the merchandise sold to founders (page 69 of transcript), and none of it is specifically earmarked for any particular purpose or pledged to any particular indebtedness.

No effort has been made to acquire property for the location of the retail outlet advertised in the promotion and contract involved, nor has any effort been made toward the selection of a site for such outlet. (page 52, transcript) No plans have been made and nothing has been stated to prospects or founders relative to what would happen in the event that the store or retail outlet is unable to open.

The corporation, Florida Discount Centers, Inc., plans to issue franchises in various other areas of the state. The plans call for

an area-co-ordinator to hold meetings in those areas for the purpose of selling merchandise and obtaining the founders in those areas in the same manner as in the Tampa area. It has been stated that the consideration for the franchises is $50,000 or $40,000 per franchise, with a down payment of $5,000, the balance to be paid by the additional outlets involved from the shares of the money that have been allotted for operating expenses on sales made by such outlets. (amended answer and witness Lott, transcript)

It is contemplated and so stated in the contract that when three thousand founders are secured, and perhaps sooner, a retail outlet or "store" will be opened.

As a distributor salesman, one who has made the initial purchase of a sewing machine or kitchen set for $320 is entitled to receive one hundred purchase authority cards to give friends, neighbors or others whom he deems to be good prospects as customers in the retail outlet or "store" to be opened. The founder is called upon to furnish to the corporation and the area-co-ordinator the names, addresses, phone numbers and places of employment of each of the distributees of these cards. Anything purchased by the holder of one of the cards will earn the founder a commission on that purchase of from 12% to 20%.

To become a supervisor, entitled to the override, a prospective participant must buy two products for a total of $620. The "supervisor" takes his two products home and equal invoice costs for the two products are placed in the products and commission account. The commission remains the same, but the supervisor and founder agree by contract that if the founder desires to be installed as a supervisor, the founder shall pay to the supervisor $1,800 in so-called "liquidated damages". The supervisor, however, agrees to allow credit and forfeit $200 of this liquidated damage for each founder one-time retail sale made by the founder prior to upgrading to supervisor. This payment is to be made through the area-co-ordinator along with the one-time retail purchase application in order that Florida Discount Centers, Inc. "may properly process the application" and verify the release of the supervisor's contract in order to pay future funds to the proper party. As a supervisor, the founder is also given one hundred purchase authority cards. Upon each purchase made against any one of these cards, the supervisor earns not less than 15% and up to 25% on every purchase made in the store. (witness Lott, page 95, transcript – answer)

Florida Discount Centers, Inc. is the purchasing agent for the outlet, although it appears that an advisory committee composed of founders would also assist the corporation by making suggestions

as to what merchandise will be purchased for sale. Florida Discount Centers, Inc. will also perform all computing and accounting services for the enterprise. (witness Lott, transcript – amended answer)

Beginning one month before the retail outlet or "store" opens, a distributor is to pay $14 a month service charge and a supervisor is to pay $20 for such service charge. These charges are designed to pay for the computing and the overhead on the store. If the founder chooses not to pay the service charge, he receives only one-half of his commission. The $14 is to be used as follows: $4 to the establishing distributor, $2 to the establishing supervisor, or a total of $6. The balance of $8 is allotted to operating the store and to keep the founders' cards active. (witness Lott, transcript – amended answer) A comparable breakdown occurs on the $20 charge.

The sale of the original merchandise is the key to the entire sales market plan involved. The sales market plan could not operate successfully without the feature of the commissions to initial founders who purchase the merchandise on sales to other founders whom they have secured, thus advancing themselves within the organization and the enterprise. The purchase of the original merchandise by the founders is purely incidental. All of the sales are motivated by a desire to make a return on the money parted with by the founders. (witness Lott, 7-82, transcript; witness Lawhead, 131-135, transcript; witness Minor, 122-126, transcript)

Some of the original sales are made on the installment plan and prospective purchasers have been referred by representatives of the promoting corporation to local loan discount houses for the purpose of borrowing money necessary for the original purchases.

Under the sales promotion arrangement, founders who purchase merchandise at the outset may, by securing other founders, advance themselves within the organizational plan to "supervisor" and, theoretically at least, could earn commissions on 2,999 sales, or over $200,000. Assuming 3,000 founders in the Tampa area, commissions on sales to founders and supervisors would amount to $270,000. Funds remaining in the production and commission account would be grossly less than this. There are presently 480 founders (witness Lott, 88 of transcript), which means that a founder, by bringing in 2500 additional founders, could advance himself and earn commissions on 2,500 founders' sales, or $176,400. (witness Lott, 89 of transcript)

In analyzing the rather intricately woven fabric of the contract involved, the court must look to substance and disregard form. It should seek reality and shun diverting flourishes and rigamarole

because the broad cover of protection to investors intended by the statutes should not and cannot be withdrawn by contrived and complicated but irrelevant formulae and promotional ipse dixit.

From such analysis of the facts, the court arrives at the following —

### Conclusions

The comprehensive, interrelated sales market plan, utilized by Florida Discount Centers, Inc., and implemented by the promotion and sale of the sewing machines and kitchen sets involved has, as its motivating factor and persuasive ingredient, the prospect of receiving sizeable monetary return for an expenditure of comparatively little cash and minimum effort and time rather than the desire to obtain the merchandise offered.

The original purchase of the items offered to prospective participants in the enterprise is incidental to the overriding and pervading incentive on the part of the purchasers to receive money by way of commissions on sales to be made by the promoters, either to new founders or to future customers at the discount outlets, or stores, which are to be established sometime in the uncertain future.

Those responding to the stimulus of the persuasion to make money purchase the merchandise only because they are told it is necessary to do so to become "founders" or "supervisors" in the enterprise and to participate in sales commissions which hopefully will pay them an indeterminate and presumably, unlimited amount of money over and above the initial outlay. This is so even though the "founders' contract", which is delivered along with the merchandise to the purchaser, clearly indicates that the cost of the original sewing machine or kitchen set is to be paid and that the item purchased will be delivered, notwithstanding the payment of commission. This is so because the founders are led to believe, although not specifically promised, that they may expect from future commissions more than enough to offset the original investment.

The plan encompasses the organization by Florida Discount Centers, Inc. of a group of prospective purchasers suggested by investing founders who are brought together in an enterprise group which, increasing through a chain process of new members securing other new members, allows advancement of the individual members of the group to positions where they in turn would receive commissions, some in the form of overrides on all purchases. The advancement is not mandatory, of course, and some founders would simply rely upon commission from sales made at the discount outlets or stores which are contemplated in the future.

It is not necessary for the court to determine whether the instant facts constitute a lottery within the historical Florida constitutional concept, as interpreted by our highest courts, because lotteries have been given a statutory definition by our Florida legislature, which definition is extremely pertinent here. That definition is found in §849.091, Florida Statutes, as follows —

> *Chain letters, pyramid clubs, etc., declared a lottery; prohibited; penalties* — The organization of any chain letter club, pyramid club, *or other group organized or brought together under any plan or device whereby fees or dues or anything of material value to be paid or given by members thereof are to be paid or given to any other member thereof, which plan or device includes any provision for the increase in such membership through a chain process of new members securing other new members and thereby advancing themselves in the group to a position where such members in turn receive fees, dues or things of material value from other members, is hereby declared to be a lottery,* and whoever shall participate in any such lottery by becoming a member of, or affiliating with, any such group or organization or who shall solicit any person for membership or affiliation in any such group or organization shall be guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than one hundred dollars, nor more than five thousand dollars, or by imprisonment in the county jail for a period of not more than two years or in the state penitentiary not less than one year nor more than ten years. (Italics added.)

The transactions activated by the purchase, sale and delivery of merchandise and the founders' contracts involved, upon the facts contained in the record of this case, constitute a promotional plan or scheme which appear to fall within the purview and intent of the governing statute and, therefore, amount to a lottery under Florida law.

Finally and decisively on this aspect of the case, however, this court is judicially constrained in its ruling by the clear decision of the First District Court of Appeal in the case of M. Lippincott Mortgage Investment Co. v. Childress, decided November 30, 1967, 204 So.2d 919, the controlling facts of which place it directly in point of law with the instant case.

The contentions of the promoting corporation in the instant case that every insurance and appliance sales business in Florida would also violate the applicable statute if the plan here is held to fall within the ruling of Lippincott is a paralogism. The aspect of increasing membership in the group by having members pay other members is not involved in the payment of commission plans employed by insurance companies and appliance firms to compensate agents and sub-agents on sales of insurance policies and appliances. The purchasers of insurance and appliances there do not become participating agents entitled to commissions or reimbursements as members of a group.

Inasmuch as the enterprise is in conflict with the statute, it is legally inoperative and, this being so, no registerable security may be issued by it. However, the court observes that the legislature has conferred broad discretionary powers upon the commission and provided, in $517.09(7) of the statute, that before permitting registration the commission should determine "that the terms of sale would be fair, just and equitable and that the enterprise or business of the issuer is not based upon unsound principles".

Hypothetically, the commission, after reviewing the facts in this case, upon application to register the contracts involved as securities, could conceivably determine that the transactions involve a lottery, that the enterprise is not based upon sound business principles and, therefore, deny the registration requested.

Thus, eliminating the portion of the operational plan voided by the statute, the founders' contract involved does, in the court's opinion, constitute a security within the meaning and intent of the Florida Securities Act.

The purpose of the Securities Act is a full and fair disclosure relative to the many types of instruments that in our complicated commercial and economic world fall within the ordinary concept of securities. Our statute embodies the application of an elastic and pliant principle to a transaction, rather than a fixed and static one in determining whether the large measure of protection afforded to persons parting with money are sheltered by the law. Applying that doctrine, one which is capable of adaptation to meet the unlimited, varied and complicated plans designed and activated by those who seek the use of the money of others on promises, expressed or implied, of profits, to all the facts before the court, in the light of realism and common sense, it is concluded that the sales market contract involved does constitute a security within the meaning and the legislative intent of the statute.

All of the elements of a profit-seeking venture are present. The investors supply the original capital and share in the ultimate earnings of the enterprise which the promoters, in reality, manage, control and operate, legal terminology to the contrary notwithstanding. The contract involves an investment of money in a common enterprise with profits to come, for all practical purposes, from the efforts of others.

The mode of operation and founders' contract were designed by persons in Alabama where, apparently, they are being used in an enterprise which is presently active. Indeed, an Alabama circuit court (the tenth judicial circuit of Alabama, case no. 147-560) on June 13, 1967, ruled negatively on the question of whether the

agreement is an "investment contract" within the purview of the Alabama Securities Statute, in a suit wherein that sole question was placed in issue.

It appears to this court that the entire plan was conceived and designed to legally skirt the effective range of statutory prohibition and remove the operation from the mischief which the law seeks to avoid or remedy and is, therefore, an example of endeavored avoidance rather than culpable evasion of legal proscription.

The court finds no actual infection of fraud tainting the operations and transactions of Florida Discount Centers, Inc. or the individuals associated with it in the employment of the plan. Their good faith has not been impugned in this proceeding.

The court also notes that a great many founders appear to be completely satisfied with their investments in the enterprise but, of course, this is also beside the legal point.

Based upon the foregoing conclusions, it is, upon consideration, ordered and adjudged that the sales market plan and contract being employed by Florida Discount Centers, Inc., Robert H. Carlton, Lawrence Duffy and Doris Lott, as officers of the corporation and individually, and as members of a class of persons participating in the market plan of Florida Discount Centers, Inc., be and the same are hereby declared to constitute a lottery within the purview and intent of Florida law and, as such, to be in violation of said law.

It is further ordered and adjudged that the sales market plan and contract being employed by the plaintiffs, Florida Discount Centers, Inc., Robert H. Carlton, Lawrence Duffy and Doris Lott, as officers of the corporation and individually, and as members of a class of persons participating in the market plan of the corporation, be and the same are hereby declared to constitute securities within the purview and intent of Florida law and, as such, must be registered in accordance with §517.12, Florida Statutes.

It is further ordered and adjudged that Florida Discount Centers, Inc., Robert H. Carlton, Lawrence Duffy and Doris Lott, as officers of the corporation and individually, and as members of a class of persons participating in the market plan of the corporation, are hereby restrained and enjoined from directly or indirectly selling or offering securities for sale in the state of Florida, or directly or indirectly engaging in practices, transactions or a course of business relating to the sale or issuance of securities of Florida Discount Centers, Inc. until such time as they comply with the

requirements of law and said securities have been registered with the Florida Securities Commission in accordance with chapter 517, Florida Statutes.